UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NICOLE CECELIA MITCHELL,

                Plaintiff,

      v.

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6729P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Nicole Cecelia Mitchell ("Mitchell") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 16, 18). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Mitchell's motion for judgment on the pleadings is denied.

_____

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of Social Security.

## BACKGROUND

### I.    Procedural Background

Mitchell protectively filed for SSI/DIB on November 6, 2012, alleging disability beginning on December 29, 2011, as a result of a left knee injury, anxiety, depression, high blood pressure, and a left shoulder injury.  (Tr. 213, 218).[2]  On December 27, 2012, the Social Security Administration denied both of Mitchell's claims for benefits, finding that she was not disabled.[3]  (Tr. 84-85).  Mitchell requested and was granted a hearing before Administrative Law Judge Michael W. Devlin (the "ALJ").  (Tr. 125-26, 136-40).  The ALJ conducted a hearing on April 30, 2014.  (Tr. 40-63).  Mitchell was represented at the hearing by her attorney, Mark J. Palmiere, Esq.  (Tr. 40, 123).  In a decision dated July 3, 2014, the ALJ found that Mitchell was not disabled and was not entitled to benefits.  (Tr. 15-39).

On October 21, 2015, the Appeals Council denied Mitchell's request for review of the ALJ's decision.  (Tr. 1-5).  Mitchell commenced this action on December 8, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

### II.    Relevant Medical Evidence

#### A.    Treatment Records

##### 1.    Brown Square Center

Treatment notes indicate that Mitchell received primary care treatment from Terri Michele Ragin ("Ragin"), PA, and Colleen T. Fogarty ("Fogarty"), MD, at Brown Square Center.  In June 2009, Fogarty ordered images of Mitchell's right and left knee due to ongoing

---

[2]  The administrative transcript shall be referred to as "Tr. __."  The transcript was electronically filed on May 9, 2016, and supplemented on July 28, 2016.  (Docket ## 9, 14).

[3]  Mitchell's previous claim for benefits was denied on October 19, 2012.  (Tr. 214).

pain.  (Tr. 475-77).  The images demonstrated medial compartment osteophytic spurring in the left knee and early degenerative changes in the medial compartment with tiny spurring in the right knee.  (*Id.*).

During an appointment with Ragin on January 28, 2010, Mitchell indicated that Zolpidem, prescribed to manage her depression and anxiety, was not effective, and she requested a trial of Ambien CR.  (Tr. 303-05).  Ragin agreed to prescribe Ambien, but noted that a depression and anxiety screen would be conducted during the next visit.  (*Id.*).

On July 14, 2010, Mitchell met with Ragin, who assessed several conditions, including diabetes mellitus, hypertension, and hyperlipidemia.  (Tr. 300-02).  During the appointment, Mitchell complained of ongoing knee pain and anxiety.  (*Id.*).  She indicated that her left knee was sometimes swollen and that her pain was worse with activity and standing. (*Id.*).  She reported having been treated by an orthopedist the previous year, who had recommended physical therapy and a knee brace.  (*Id.*).  She requested a referral to a sports medicine specialist.  (*Id.*).  Regarding her anxiety, Mitchell described feeling stressed and worried.  (*Id.*).  She reportedly did not find the Ambien effective and had tried Paxil in the past without relief.  (*Id.*).  She reported previous relief using Xanax.  (*Id.*).  She requested a referral for mental health treatment.  (*Id.*).

Ragin noted tenderness to palpation in the lateral anterior joint of the left knee and crepitus, although range of motion was intact.  (*Id.*).  She noted that imaging from the previous year had demonstrated mild degenerative changes.  (*Id.*).  She assessed osteoarthritis and instructed Mitchell to continue taking Naprosyn and Ultraset.  (*Id.*).  She also referred Mitchell to a sports medicine specialist for evaluation of the knee pain.  (*Id.*).  With respect to Mitchell's

anxiety, Ragin discontinued Ambien and prescribed Zolpidem and a short course of Xanax. (*Id.*). She referred Mitchell to a mental health provider. (*Id.*).

Mitchell returned on October 20, 2010, for an appointment with Ragin. (Tr. 292-94). Mitchell complained of increasing depression, frustration, and stress. (*Id.*). She reported experiencing periods of panic characterized by shortness of breath and chest pressure. (*Id.*). Although Mitchell had begun treatment at Unity, she reported that she would not be able to see a psychiatrist for approximately two months. (*Id.*). She cried during the appointment and appeared agitated. (*Id.*). Ragin prescribed Xanax and Zoloft. (*Id.*).

On January 18, 2011, Mitchell returned for an appointment with Ragin. (Tr. 285-87). Mitchell complained of sleep disturbance and an anxious mood. (*Id.*). She reported that she had missed some appointments with her counselor and had not yet been evaluated by a psychiatrist. (*Id.*). According to Mitchell, her therapist had recommended group therapy, but Mitchell was not inclined to participate. (*Id.*). Ragin refilled Mitchell's prescription for Xanax and Zoloft and advised her to remain compliant with the treatment plan recommended by her mental health provider. (*Id.*).

During an appointment with Fogarty on May 19, 2011, Mitchell reported abusing prescription medication, including Percocet and Ambien, due to back pain. (Tr. 273-75). Mitchell indicated that she had attempted mental health treatment, which was not helpful because group therapy had been recommended. (*Id.*). Mitchell returned the following week for a follow-up appointment with Fogarty. (Tr. 271-72). During the appointment, she presented as irritable and impatient. (*Id.*). Mitchell was advised to follow up regarding her anxiety in approximately one month. (*Id.*).

4

Treatment notes dated October 7, 2011, indicate that an intern from Unity Mental Health contacted Fogarty's office to express concern regarding Mitchell's increased anxiety attacks and depression. (Tr. 268-69). The intern noted that Mitchell would not be evaluated by a psychiatrist until the end of November and would need medication in the meantime. (*Id.*). During an appointment that day with Fogarty, Mitchell reported feeling tired and agitated and that Paxil was not alleviating her symptoms. (*Id.*). Mitchell indicated that she was not aware that she was supposed to have increased her dosage and stated that she stopped taking the medication. (*Id.*). She reported feeling sad, agitated, irritable, and tired, and that she was no longer taking any mental health medication. (*Id.*). Fogarty discontinued Zoloft, instructed Mitchell to continue taking Paxil, and prescribed Xanax as needed. (*Id.*).

Mitchell returned for an appointment with Ragin on October 19, 2011. (Tr. 352-53). She complained of severe left knee pain and reported that she had visited a walk-in clinic over the weekend due to the pain. (*Id.*). According to Mitchell, images were taken, but she was not informed of the results. (*Id.*). Additionally, she was given a prescription for Naproxen. (*Id.*). She complained that her knee felt as though it was "cracking" and frequently gave out. (*Id.*). According to Mitchell, she walked a lot for her job, which exacerbated her pain. (*Id.*). She reported that she had previously participated in physical therapy and had not seen her orthopedist in approximately one year. (*Id.*).

Upon examination, Ragin noted mild swelling, crepitus, and clicking in the left knee. (*Id.*). She noted that Mitchell walked with a limp, but was able to bear weight. (*Id.*). She reviewed the images taken over the weekend and noted that they demonstrated mild arthritis. (*Id.*). She recommended that Mitchell use a knee brace and continue to take Naprosyn and

5

Tramadol.  (*Id.*).  She referred Mitchell for an MRI to assess for soft tissue damage and to an orthopedist.  (*Id.*).

Mitchell returned for an appointment with Fogarty on October 26, 2011. (Tr. 350-51).  Mitchell continued to suffer from left knee pain and requested a refill for Xanax. (*Id.*).  Fogarty noted that the knee brace that had been prescribed was not covered by Mitchell's insurance and that Mitchell continued to work, despite the fact that Ragin had written a note to excuse her from work.  (*Id.*).  Upon examination of the knee, Fogarty noted mild inflammation, full range of motion with pain, mild crepitus, and tenderness to palpation.  (*Id.*).  She recommended that Mitchell continue to take Naprosyn and Tramadol while she awaited an MRI and an orthopedic evaluation.  (*Id.*).

On November 10, 2011, Mitchell attended an appointment with Ragin to review her MRI results.  (Tr. 348-49).  Mitchell reported that she was scheduled to see an orthopedist at the end of the month.  (*Id.*).  She indicated that despite her continued use of medication, she was still in significant pain.  (*Id.*).  The MRI of her left knee demonstrated a tear of the anterior horn of the lateral meniscus and a tear of the inner margin of body of medial meniscus.  (*Id.*).  It also revealed abnormal signal intensity involving the anterior cruciate ligament due to either degeneration or a sprain, osteoarthritis, moderate size effusion, and a small Baker's cyst.  (*Id.*). Ragin assessed a torn meniscus and indicated that Mitchell might need surgery to correct it. (*Id.*).  Mitchell indicated that the standing and walking requirements of her job exacerbated her pain.  (*Id.*).  Ragin advised her to contact her human resources department to determine whether she was eligible for leave.  (*Id.*).  Ragin prescribed Amitriptyline to manage pain and ameliorate anxiety and sleep issues.  (*Id.*).

6

Mitchell attended another appointment with Fogarty on January 12, 2012. (Tr. 346-47). During the appointment she complained of ongoing knee pain, reported that she had been scheduled for knee surgery, and requested pain medication and that Fogarty complete a disability form. (*Id.*). Fogarty advised her that she would need to consult with her orthopedist who was providing post-operative care. (*Id.*).

On June 14, 2012, Mitchell returned for an appointment with Ragin. (Tr. 342-43). She reported that she had had surgery on her left knee in February 2012 and had participated in physical therapy for a time. (*Id.*). Her orthopedist had scheduled another MRI and had indicated that she might need another surgery. (*Id.*). She also reported an upcoming appointment at the pain clinic. (*Id.*). According to Mitchell, her knee pain was worse at the end of the day, despite taking Naprosyn, Ibuprofen, and Tramadol. (*Id.*). Upon examination, Ragin noted mild swelling and painful range of motion. (*Id.*). Ragin prescribed Vicodin as needed for severe pain and advised her to follow up with her orthopedist. (*Id.*).

An MRI conducted on June 18, 2012, revealed a mucoid degeneration of the ACL, post-operative changes with no definite re-tear, tricompartmental mild chondral wear, a small joint effusion, and a small neck of a Baker's cyst. (Tr. 378-79). On June 28, 2012, Mitchell attended an appointment with Fogarty. (Tr. 340-41). She complained of right knee pain, perhaps as a result of her inability to bear weight on her left knee. (*Id.*). She also reported that she was not working and was experiencing increased stress. (*Id.*).

On February 6, 2013, Mitchell attended an appointment with Ragin. (Tr. 334-35). Ragin assessed Mitchell's depression as moderate. (*Id.*). She also reported ongoing pain in her left knee. (*Id.*). By letter dated February 12, 2013, Ragin declined to complete a medical

questionnaire in connection with Mitchell's claim for benefits, instead requesting that Mitchell "have an independent medical examination to determine the degree of disability." (Tr. 383).

### 2. <u>University of Rochester Orthopaedics</u>

On October 29, 2009, Mitchell attended an appointment with Dr. DeHaven ("DeHaven") with the Orthopaedics Department of the University of Rochester Medical Center complaining of ongoing knee pain for the previous six months. (Tr. 478-79). Mitchell reported pain and cracking that had increased in intensity over the previous two months, which was aggravated by weight bearing and activity. (*Id.*). She reported that she had attempted physical therapy and NSAIDs for the previous eight weeks without relief. (*Id.*).

Upon examination, DeHaven noted moderate effusions bilaterally on Mitchell's knees with decreased range of motion. (*Id.*). Mitchell demonstrated palpable pain on the medial joint lines and some mild pain on the lateral joint line, with greater pain on the right side. (*Id.*). Mitchell also complained of patellar crepitus, pain with patellar movement, and lateral patellar subluxation. (*Id.*). The Lacman, posterior drawer and circumduction tests were all negative, and her sensation was intact. (*Id.*).

DeHaven recommended against corticosteroid injections given Mitchell's relatively young age and recent x-rays that did not reveal significant osteoarthritis. (*Id.*). DeHaven recommended that she continue to take Naproxen and return in one week for imaging. (*Id.*). Imaging conducted on November 6, 2009, demonstrated no significant changes in the right knee and a small central osteophyte on the left knee, without joint effusion or substantial joint space narrowing. (Tr. 480).

On November 17, 2011, Mitchell attended an appointment with Gregg Nicandri ("Nicandri"), MD, and Lindsey Caldwell, a medical resident. (Tr. 397-98). Mitchell complained

of ongoing left knee pain that had worsened since she had been treated in 2009.  (*Id.*).  Mitchell reported difficulty ambulating and was concerned about her ability to return to work.  (*Id.*).  She requested a further evaluation following an MRI ordered by her primary care physician.  (*Id.*).  Mitchell reported some swelling and occasional popping and locking in her knee.  (*Id.*).

Upon examination, Mitchell was able to ambulate without assistance, and her lower right extremity demonstrated full range of motion with minimal tenderness.  (*Id.*).  Mitchell's left knee had moderate effusion with pain on patellar grind and palpation of the medial and lateral aspects of the patella.  (*Id.*).  Mitchell demonstrated pain and crepitus on range of motion of her left knee, although she did demonstrate full range of motion.  (*Id.*).  Her MRI revealed diffuse degenerative changes throughout the knee, including the lateral meniscus, the ACL and the chondromalacia of the patella, and joint effusion.  (*Id.*).  A cortisone injection was administered at that time, along with a prescription for physical therapy.  (*Id.*).

Mitchell returned for an appointment with Nicandri and another medical resident on December 29, 2011.  (Tr. 399-400).  Mitchell reported that the injection had provided relief for approximately two weeks and that physical therapy was not alleviating her pain.  (*Id.*).  She wanted to discuss surgical options.  (*Id.*).  A physical examination revealed an obvious effusion of the left knee and, although she retained range of motion, her gait was hindered by a limp.  (*Id.*).  Nicandri recommended arthroscopic left knee surgery to address the lateral meniscus and the patellar cartilage.  (*Id.*).  He prescribed Vicodin to manage Mitchell's pain until surgery.  (*Id.*).

Nicandri performed surgery on Mitchell's left knee on February 13, 2012.  (Tr. 401-03).  Following surgery, Nicandri recommended that Mitchell remain non-weight

bearing for approximately six weeks and start a rehabilitation program to increase her range of motion.  (*Id.*).

On February 15, 2012, Mitchell attended an unscheduled appointment with Nicandri because her surgical site was bleeding.  (Tr. 404).  Upon examination, Nicandri noted that her surgical incision was well-healed with no active bleeding.  (*Id.*).  He assessed appropriate post-surgical discharge and instructed her to continue with post-operative exercises and to begin physical therapy as instructed.  (*Id.*).

Mitchell returned on February 22, 2012, for her scheduled post-operative appointment.  (Tr. 405).  She complained of pain and, upon examination, demonstrated full extension and flexion to 95 degrees.  (*Id.*).  She was instructed to continue physical therapy to improve her range of motion and to follow up in approximately one month.  (*Id.*).

On March 15, 2012, Mitchell returned for a follow-up appointment with Nicandri. (Tr. 406-07).  Mitchell complained of continued pain, although she demonstrated "excellent range of motion," with full extension and flexion to 130 degrees.  (*Id.*).  Mitchell reported that she continued to maintain her non-weight bearing status, although she admitted to placing weight on her left leg occasionally at home.  (*Id.*).  Nicandri noted significant tenderness to palpation, although Mitchell was neurovascularly intact.  (*Id.*).  Nicandri recommended that she continue to avoid bearing weight on her left leg for two more weeks and continue her range of motion exercises.  (*Id.*).  He also prescribed a brace and advised her to follow up in two to three weeks. (*Id.*).

Approximately two weeks later, Mitchell returned for an appointment with Nicandri.  (Tr. 410-11).  Despite instructions to remain non-weight bearing, Mitchell reported she had not been compliant.  (*Id.*).  Mitchell continued to suffer significant pain and was still

taking narcotic pain medication.  (*Id.*).  Upon examination, Nicandri noted a knee effusion and tenderness to palpation with good range of motion.  (*Id.*).  He noted that she had been compliant with physical therapy and offered a cortisone injection to relieve the pain and inflammation in her knee.  (*Id.*).  The injection was administered without complication, and Nicandri advised Mitchell to continue using the knee brace.  (*Id.*).

A note dated October 12, 2012, indicated that Mitchell's next appointment with Nicandri was rescheduled for January 31, 2013, so that her progress could be better evaluated after treatment at the URMC Sawgrass Pain Clinic.  (Tr. 564).  On January 3, 2013, Wenjing Zeng authored a note on behalf of Nicandri.  (Tr. 393).  The note indicated that Mitchell would be undergoing a series of injections and would be unable to work for at least five weeks, after which she would be reevaluated.  (*Id.*).  On January 31, 2013, Nicandri apparently completed a form indicating that Mitchell was not able to return to work, had not yet reached maximum improvement, and would be reevaluated on April 18, 2013.  (Tr. 394-95).

On September 12, 2013, Mitchell attended an appointment with Taylor Buckley ("Buckley"), MD.  (Tr. 412).  During the appointment, Mitchell reported that she had been attending appointments at the pain management clinic, but was frustrated by the clinic's willingness to prescribe opioid medications.  (*Id.*).  She also reported continued physical therapy with minimal progress.  (*Id.*).  Buckley noted that Mitchell previously had surgery on her knee, as well as corticosteroid and Hyalgan injections.  (*Id.*).  Upon examination, Buckley noted tenderness to palpation, and pain and crepitus with range of motion.  (*Id.*).  Buckley did not recommend any new intervention, but instructed Mitchell to continue with pain management treatment and physical therapy.  (*Id.*).

3.    **Sawgrass Pain Treatment Center**

On June 19, 2012, Mitchell attended an appointment with Joel L. Kent ("Kent"),

MD, at the Sawgrass Pain Treatment Center. (Tr. 252-54). Mitchell reported that she had

undergone a left knee arthroscopy in February 2012 and that her pain had been worsening since

then. (*Id.*). According to Mitchell, she experienced pain while resting, which was aggravated by

activity, including climbing stairs, bending, and adjusting positions during sleep. (*Id.*). Mitchell

reported that she could alleviate her pain by lying down, taking medications, or applying heat or

a TENS unit. (*Id.*). She described her pain as sharp, with numbness and tingling sensations.

(*Id.*). She reported swelling, redness, and clicking of the left knee with increased activity. (*Id.*).

According to Mitchell, she had been attending physical therapy, but her treatment was on hold

pending an MRI. (*Id.*). Mitchell reported that she had used a TENS unit at therapy, which

provided relief. (*Id.*).

Upon examination of the left knee, Kent noted no swelling, coloring, or

tenderness to palpation of the medial femur condyle or tibial condyle. (*Id.*). Kent did observe

tenderness to palpation of the medial aspect of the patella and crepitus upon flexion of the left

knee. (*Id.*). Mitchell was able, with pain, to fully flex and extend her left knee. (*Id.*). Mitchell

demonstrated an antalgic gate and 4/5 muscle strength in her left leg. (*Id.*).

Kent assessed that Mitchell suffered from chronic left knee pain post-arthroscopy

and indicated that the pain was most likely nociceptive in nature and did not have a significant

neuropathic component. (*Id.*). He recommended that she ask her psychiatrist to prescribe either

Cymbalta or Effexor to manage her depression and chronic pain. (*Id.*). He also provided a

prescription for a home TENS unit and recommended Voltaren gel and use of another NSAID,

such as Nabumetone or Meloxicam. (*Id.*). With respect to Mitchell's ongoing use of Vicodin,

Kent noted a risk of opioid abuse and recommended close monitoring and urine screens, but recommended continued use while awaiting the MRI results. (*Id.*). He recommended that Mitchell return in approximately three months. (*Id.*).

Mitchell attended another appointment with Kent on September 19, 2012. (Tr. 248-49). Mitchell reported that she continued to experience significant pain in her knees, particularly her left knee. (*Id.*). Her orthopedic physician had attempted an injection, but was not able to complete the process due to her discomfort. (*Id.*). Mitchell reported no relief from the attempted injection and indicated that the TENS unit had provided modest relief. (*Id.*). Mitchell explained that she believed she was disabled due to her ongoing knee pain and raised the issue of disability several times during the appointment. (*Id.*). According to Kent, Mitchell was actively pursuing disability benefits and intended to pursue a workers' compensation claim related to her knee. (*Id.*).

Mitchell complained of non-radiating pain in her left knee that was exacerbated by use or bearing weight. (*Id.*). She also noted waxing and waning left knee effusion and catching or episodic locking of the left knee. (*Id.*). Upon examination, Kent noted that Mitchell was able to stand guardedly from a seated position and walked with an asymmetric and antalgic gait, limiting weight bearing on the left leg. (*Id.*). He noted a small effusion of the left knee and bilateral crepitus with range of motion that was greater on the left side. (*Id.*).

Kent recommended that Mitchell continue use of anti-inflammatory agents and discontinue opioid analgesics. (*Id.*). He prescribed Notriptyline, but advised her to obtain approval from her mental health providers. (*Id.*). He also recommended that she follow up with her orthopedic physician to reattempt injections. (*Id.*). Kent noted that her prognosis for pain

management was somewhat guarded and that she remained extremely symptomatic despite appropriate conservative therapy.  (*Id.*).

4.    <strong><u>Strong Memorial Hospital Physical Therapy</u></strong>

In accordance with Nicandri's advice, Mitchell began attending physical therapy sessions for her knee on December 23, 2011.  (Tr. 391-92).  Mitchell complained of ongoing left knee pain that had worsened over the last several months.  (*Id.*).  According to Mitchell, her pain was intermittent and at a level of eight out of ten.  (*Id.*).  Upon examination, the therapist observed tenderness to palpation along the medial lateral joint line.  (*Id.*).  Mitchell demonstrated an antalgic gait and difficulty with balance.  (*Id.*).  The therapist recommended that Mitchell attend weekly or biweekly sessions for four to six weeks.  (*Id.*).  On January 23, 2012, Mitchell was discharged from physical therapy.  (Tr. 390).  The medical records indicate that Mitchell failed to attend any additional appointments after her initial appointment.  (*Id.*).

Mitchell returned for a physical therapy session on February 22, 2012. (Tr. 388-89).  The treatment notes indicate that she had surgery on her left knee on February 13, 2012.  (*Id.*).  Although her doctor had instructed her to avoid weight bearing on her left leg for six weeks, she presented at the appointment bearing full weight on that leg.  (*Id.*).  Mitchell reported that she had been out of work since December 29, 2011, and continued to suffer constant chronic pain in her left knee.  (*Id.*).  Her symptoms were aggravated by walking, climbing stairs, squatting, and flexing her knee.  (*Id.*).  She indicated that she achieved some pain relief with pain medication and ice.  (*Id.*).  Mitchell reported difficulty walking, bending her knee, and getting in and out of her vehicle.  (*Id.*).  The therapist recommended weekly or biweekly appointments for eight to twelve weeks.  (*Id.*).

14

Mitchell returned for an appointment on March 26, 2012.  (Tr. 386-87).  Again, Mitchell appeared to be bearing weight on her left leg, and she complained of ongoing pain, particularly when walking or climbing stairs.  (*Id.*).  Her therapist noted that she was making slow progress and questioned whether she was complying with her recommended home exercise program.  (*Id.*).  He recommended continued therapy.  (*Id.*).

### 5.    <u>University Sports and Spine Rehabilitation</u>

On September 18, 2013, Mitchell attended a physical therapy session with Elizabeth Whetmore ("Whetmore").  (Tr. 412-13).  Mitchell reported that she continued to experience ongoing pain and had been performing home exercises.  (*Id.*).  Upon examination, Whetmore noted that her range of motion was unchanged with tightness in the hamstrings and that her strength had improved.  (*Id.*).  Whetmore recommended that Mitchell continue therapy once a week.  (*Id.*).

Mitchell returned on October 9, 2013.  (Tr. 413-14).  She reported no improvement in her knee pain and felt that her knee was "bone on bone."  (*Id.*).  Whetmore noted tenderness to palpation and limitations in Mitchell's range of motion, strength, and functioning.  (*Id.*).  She recommended that Mitchell continue therapy.  (*Id.*).

Mitchell returned for an appointment on October 29, 2013, and reported that the cold weather was aggravating her knee pain.  (Tr. 415-16).  She also indicated that she needed a copy of her recommended exercises to provide to her attorney.  (*Id.*).  Upon examination, Mitchell's range of motion and functioning were unchanged, although her strength had improved.  (*Id.*).

On November 7, 2013, Mitchell attended another appointment with Whetmore.  (Tr. 420-21).  Mitchell reported increased pain and that she had gone to the emergency

department due to lower back pain, which she thought may have been caused by a new exercise added to her therapy program. (*Id.*). Mitchell's range of motion and functioning remained unchanged. (*Id.*). Whetmore noted that Mitchell was responding favorably to treatment and recommended continuing her current plan of care. (*Id.*).

Mitchell attended another session on December 20, 2013. (Tr. 425-27). Mitchell reported ongoing knee pain and swelling, although she believed she had made some progress. (*Id.*). She reported some feelings of depression and indicated that she was seeing a mental health counselor. (*Id.*). Mitchell did not want to discontinue therapy sessions due to her pending disability claim. (*Id.*). According to Mitchell, her attorney had advised her to "keep her therapy visits." (*Id.*). Whetmore assessed that Mitchell continued to have strength, functioning, and range of motion limitations, and that her prognosis was poor given her limited progress to date. (*Id.*). Mitchell agreed to focus on her mental health and to continue her home exercise program, and Whetmore recommended she follow up for evaluation in one month. (*Id.*).

### 6.    <u>Strong Memorial Hospital</u>

On October 31, 2013, Mitchell presented to the emergency department complaining of back pain. (Tr. 416-20). Mitchell reported that the pain had started two days earlier, had been constant, and had not been alleviated by Tylenol, Ibuprofen, or NSAIDs. (*Id.*). She denied experiencing any recent injury or trauma. (*Id.*). Upon examination, Mitchell demonstrated tenderness with no edema and normal range of motion in her lumbar spine. (*Id.*). Mitchell was offered Flexeril and Naproxen, which she declined, stating that they did not alleviate her pain. (*Id.*). Because she had driven herself to the emergency department, she could not be given any stronger medication. (*Id.*). She was discharged with a prescription for Percocet and instructions to follow up with her primary care physician for further pain management. (*Id.*).

16

On December 16, 2013, Mitchell returned to the emergency department complaining of cold symptoms, including chills, body aches, persistent cough, and chest pain. (Tr. 421-24). She was diagnosed with a possible viral infection or the flu. (*Id.*). She was advised to stay hydrated and to take Tylenol with Codeine for cough and pain. (*Id.*).

### 7.    Unity Mental Health at Pinewild

On July 21, 2011, Mitchell attended a mental health intake evaluation at Unity Mental Health's Pinewild Clinic ("Pinewild"). (Tr. 549-62). On that date, she met with Elizabeth Munson ("Munson"), a mental health counseling intern. (*Id.*). Mitchell reported that she was experiencing feelings of depression, lethargy, and anxiety characterized by shortness of breath and heart palpitations. (*Id.*). Mitchell reported that she was currently taking Paxil and Ambien, which had been prescribed by her primary care physician a few months earlier. (*Id.*). According to Mitchell, she had felt anxious and overwhelmed for the past several years. (*Id.*).

Mitchell was raised in foster care, and both of her parents had substance abuse issues. (*Id.*). According to Mitchell, she experienced some behavioral issues in school and had difficulty paying attention. (*Id.*). Mitchell was currently working part-time as a security guard. (*Id.*). Mitchell believed that full-time work would be too difficult for her. (*Id.*). Mitchell reported that she had been hospitalized for suicidal thoughts in 1995 after her husband had left her for another woman while she was pregnant with their first child. (*Id.*). Mitchell had three children: a twenty-one year old daughter and two sons, aged fifteen and nine, who were living with her. (*Id.*).

Mitchell presented as unkempt, agitated, apathetic, evasive, and restless, with an anxious, depressed, and irritable mood and affect. (*Id.*). She cried during the appointment and had difficulty understanding and responding to questions. (*Id.*). Munson assessed that Mitchell

suffered from panic disorder and anxiety disorder, not otherwise specified, and assessed a Global Assessment of Functioning ("GAF") of 59. (*Id.*). Munson recommended individual therapy sessions and a psychiatric evaluation. (*Id.*). Munson's evaluation was reviewed by Laura Peet ("Peet"), LMHC. (*Id.*).

On December 6, 2011, Mitchell met with Kathleen S. Klein ("Klein"), NPP-C, for a psychiatric evaluation. (Tr. 538-48). During the appointment, Mitchell appeared in appropriate attire and exhibited normal speech, perceptions, and thought content. (*Id.*). Her mood was euthymic and anxious, and she displayed a constricted affect. (*Id.*). Mitchell reported that she was not currently experiencing any depressive symptoms, but exhibited symptoms consistent with a diagnosis of anxiety disorder. (*Id.*). Klein increased Mitchell's Paxil dosage, recommended that she continue taking Xanax, and prescribed Ambien as needed. (*Id.*).

Mitchell returned for a medication management appointment with Klein on March 2, 2012. (Tr. 532-37). Mitchell reported that she recently had knee surgery and was in pain, which had increased her anxiety. (*Id.*). Klein assessed that Mitchell remained stable on her current medication. (*Id.*). Klein recommended that she continue psychotherapy and her medication regimen and return in three months. (*Id.*).

On May 29, 2012, Mitchell met with Klein for another medication management appointment. (Tr. 328-32). Mitchell reported feeling generally all right, although she continued to experience pain in her knee that triggered her anxiety. (*Id.*). She reported continuing to take her prescribed medications without adverse effects. (*Id.*). Klein recommended that she continue psychotherapy and medication and return in three months. (*Id.*).

On August 23, 2012, Mitchell attended another appointment with Klein. (Tr. 526-31). During the appointment, Mitchell reported that she had lost her job because she

had been out on disability for a prolonged period. (*Id.*). She reported increased stress and continuing pain in her knee. (*Id.*). Mitchell's mood was stable, and she reported that her medications helped to alleviate her anxiety. (*Id.*). Klein suggested switching from Xanax to Klonopin, but Mitchell was reluctant to change medication. (*Id.*). Klein recommended that Mitchell continue psychotherapy and medication and return in three months. (*Id.*).

On September 20, 2012, Mitchell reported to Unity Hospital's walk-in clinic complaining of a panic attack. (Tr. 506-10). She was prescribed Hydroxyzine and advised to follow up with her primary care physician and mental health providers. (*Id.*).

On September 27, 2012, Mitchell was informed that her primary therapist had left the practice and that Mary LoVerdi ("LoVerdi"), LMSW, would assume primary responsibility for her case. (Tr. 265). On October 2, 2012, Mitchell attended an appointment with LoVerdi. (Tr. 520-25). During the appointment, Mitchell reported feelings of depression and anxiety due to physical and social stressors. (*Id.*). She also reported recent episodes of panic attacks. (*Id.*). According to Mitchell, her surgery had altered her ability to perform her normal activities. (*Id.*). LoVerdi advised Mitchell to return in three weeks. (*Id.*).

Mitchell attended another appointment with Klein on November 20, 2012. (Tr. 316-21). Mitchell reported that her mood was labile, with good days and bad days. (*Id.*). She continued to experience anxiety and stressors and frequently ruminated. (*Id.*). Mitchell reported compliance with her medication regimen, which she felt helped her anxiety. (*Id.*). Mitchell was experiencing financial stress and reported that she was applying for benefits. (*Id.*). Klein recommended that Mitchell continue psychotherapy and medication and return in three months. (*Id.*).

On December 4, 2012, Mitchell met with LoVerdi for individual therapy.

(Tr. 311-15).  During the appointment, Mitchell reported stress and frustration relating to the

holiday season and her attempts to manage her bills.  (*Id.*).  She reported increased mood

instability and an inability to organize her responsibilities.  (*Id.*).  LoVerdi recommended that

Mitchell return in three weeks.  (*Id.*).

During 2013, Mitchell met with LoVerdi approximately once a month.

(Tr. 583-625).  During the sessions, Mitchell generally presented as anxious or depressed.  (*Id.*).

Generally, she reported ongoing anxiety and low self-worth relating to her inability to work and

her financial struggles.  (*Id.*).  She also discussed difficulty managing her children's behavior and

her household responsibilities.  (*Id.*).  She repeatedly expressed frustration with her medical

condition and her lack of employment.  (*Id.*).  Mitchell generally reported that her medications

helped alleviate her anxiety and other mood lability.  (*Id.*).  LoVerdi frequently explored coping

skills to assist Mitchell to manage her mood instability and improve her organization.  (*Id.*).  She

assessed Mitchell's GAF between high-50s and low-60s.  (*Id.*).

Beginning in August 2013, Mitchell reported that she had begun exploring

employment opportunities and had been researching part-time positions.  (*Id.*).  In November

2013, Mitchell reported that she was exploring educational opportunities to facilitate her

eventual employment.  (*Id.*).

Mitchell continued treatment with LoVerdi approximately once a month in early

2014.  (Tr. 567-82).  In January and February 2014, Mitchell reported ongoing pain related to her

knee surgery, and increased anxiety and frustration due to ongoing financial stressors.  (*Id.*).

During a session on April 8, 2014, Mitchell reported that despite ongoing anxiety, she felt ready

to return to the workforce.  (*Id.*).  According to Mitchell, she believed that returning to work

would help her feel less isolated and more productive. (*Id.*). LoVerdi assisted Mitchell in completing paperwork relating to her return to work. (*Id.*). Mitchell returned for an appointment on April 24, 2014, and reported mood instability due to her inability to obtain employment. (*Id.*).

### B.    Medical Opinion Evidence

#### 1.    Christine Ransom, PhD

On September 26, 2012, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Mitchell. (Tr. 515-18). Mitchell reported that she drove herself to the appointment and currently lived with her two children, aged sixteen and ten. (*Id.*). Mitchell also reported that she had received education in a regular classroom setting and had obtained her GED. (*Id.*). Mitchell had stopped working in February 2012 due to problems with her left knee. (*Id.*).

According to Mitchell, she had no difficulty sleeping, but had decreased appetite. (*Id.*). Mitchell reported depressive symptoms, including crying spells, irritability, low energy, wandering thoughts, and difficulty concentrating. (*Id.*). Mitchell also reported anxiety, including panic attacks characterized by heart palpitations, sweating, and difficulty breathing. (*Id.*). Despite these symptoms, Mitchell indicated that she continued to socialize with friends and family. (*Id.*). According to Mitchell, she had experienced one panic attack that had caused her to seek treatment in the emergency department. (*Id.*). Mitchell indicated that she constantly worried about her finances, depression, and inability to work. (*Id.*). She denied experiencing generalized anxiety, manic symptomatology, thought disorder, or cognitive symptoms or deficits. (*Id.*).

Mitchell reported that she was able to care for her personal hygiene, prepare meals, and perform household chores, including laundry and shopping. (*Id.*). According to Mitchell, she was able to manage her money and drive. (*Id.*). Mitchell indicated that she had difficulty completing some tasks due to knee pain. (*Id.*). Additionally, Mitchell reported frequent worrying and recent onset of panic attacks. (*Id.*).

Upon examination, Ransom noted that Mitchell appeared neatly dressed and adequately groomed, with lethargic motor behavior, and exhibited an abnormal gait characterized by a left-sided limp and downcast eye contact. (*Id.*). Ransom opined that Mitchell had slow and halting speech with adequate language, coherent and goal-directed thought processes, moderately dysphoric affect and mood, clear sensorium, full orientation, and average intellectual functioning with a general fund of information appropriate to her experience. (*Id.*). Ransom noted that Mitchell's attention and concentration were moderately impaired by depression. (*Id.*). Mitchell could count backwards from ten and complete two out of three simple calculations, but had difficulty with the serial threes. (*Id.*). Mitchell could recall one out of three objects immediately and one out of three objects after five minutes, and could complete three digits forward and two backward. (*Id.*). According to Ransom, Mitchell's immediate memory skills were moderately impaired by depression. (*Id.*).

Ransom opined that Mitchell could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, and learn simple new tasks. Ransom further opined that Mitchell would have moderate difficulty performing complex tasks and appropriately dealing with stress, although she could relate adequately with others. (*Id.*). According to Ransom, Mitchell's difficulties were secondary to major depressive disorder, currently moderate, and

anxiety disorder, not otherwise specified, currently moderate.  (*Id.*).  Ransom opined that the results of her examination were consistent with Mitchell's allegations and that Mitchell's prognosis was fair to good with continued treatment.  (*Id.*).

## 2.    Harbinder Toor, MD

On September 26, 2012, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination.  (Tr. 511-14).  Mitchell reported suffering from constant pain in her left knee since approximately 2011.  (*Id.*).  According to Mitchell, the pain was constant and sharp, and typically at a level of nine out of ten.  (*Id.*).  Mitchell reported that the pain radiated to her lower and sometimes upper left leg and could be accompanied by swelling.  (*Id.*).  Mitchell indicated that she had difficulty standing, walking, squatting, lifting, balancing, and sometimes sitting for prolonged periods.  (*Id.*).  Mitchell also reported suffering from hypertension, diabetes, anxiety, depression, and panic attacks.  (*Id.*).  Surgery had been performed on Mitchell's left knee in February 2012.  (*Id.*).

Mitchell reported that she cooked three times a week, cleaned the house once a week, and was able to do laundry and shop.  (*Id.*).  She dressed and showered weekly without assistance.  (*Id.*).  She reportedly enjoyed watching television and listening to the radio.  (*Id.*).

Upon examination, Toor noted that Mitchell had an abnormal gait and appeared to be in moderate pain.  (*Id.*).  She declined to attempt the heel and toe walk or squatting due to pain.  (*Id.*).  Mitchell did not need assistance to change for the examination or to get on and off the examination table, but had difficulty rising from the chair.  (*Id.*).

Toor noted that Mitchell's cervical spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally.  (*Id.*).  He found that Mitchell's lumbar flexion was limited to thirty degrees, extension zero degrees, and her lateral flexion and rotation

were limited to thirty degrees bilaterally.  (*Id.*).  The straight leg raise was negative in both the

sitting and supine positions.  (*Id.*).  Toor found full range of motion in the shoulders, elbows,

forearms, wrists, ankles, and hips.  (*Id.*).  He found the left knee flexion and extension limited to

140 degrees with pain and tenderness, but full range of motion in the right knee.  (*Id.*).  Toor

assessed that Mitchell's hand and finger dexterity was intact, and her grip strength was five out

of five bilaterally.  (*Id.*).  He noted tenderness, pain, and swelling in the left knee, and tenderness

in the lower leg.  (*Id.*).

Toor opined that Mitchell had moderate to severe limitations standing, walking,

squatting, and lifting, and that pain interfered with her balance.  (*Id.*).  He also assessed moderate

limitations sitting for a long time.  (*Id.*).

### 3.    T. Harding, Psychology

On October 17, 2012, agency medical consultant Dr. T. Harding ("Harding")

completed a Psychiatric Review Technique.  (Tr. 93, 96-99).  Harding concluded that Mitchell's

mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Harding,

Mitchell suffered from mild limitations in her activities of daily living and moderate limitations

in her ability to maintain social functioning and to maintain concentration, persistence, or pace.

(*Id.*).  In addition, according to Harding, Mitchell had not suffered from repeated episodes of

deterioration.  (*Id.*).  Harding completed a mental Residual Functional Capacity ("RFC")

assessment.  (*Id.*).  Harding opined that Mitchell suffered from moderate limitations in her ability

to understand, remember, and carry out detailed instructions, maintain attention and

concentration for extended periods, to work in coordination with or proximity to others without

distraction, to complete a normal workday and workweek without interruptions from

psychologically-based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (*Id.*). Harding opined that Mitchell retained the ability to perform unskilled and some semi-skilled work, despite these limitations. (*Id.*).

### 4.    A. Hochberg, Psychology

On December 26, 2012, agency medical consultant Dr. A. Hochberg ("Hochberg") completed a Psychiatric Review Technique. (Tr. 67-68, 70-71). Hochberg concluded that Mitchell's mental impairments did not meet or equal a listed impairment. (*Id.*). According to Hochberg, Mitchell suffered from mild limitations in her activities of daily living and her ability to maintain social functioning, and moderate limitations in her ability to maintain concentration, persistence, or pace. (*Id.*). Hochberg completed a mental RFC assessment. (*Id.*). Hochberg opined that Mitchell suffered from moderate limitations in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Hochberg opined that Mitchell retained the ability to perform simple jobs, despite these limitations. (*Id.*).

### 5.    LoVerdi's Opinions

On January 17, 2014, LoVerdi completed a psychological assessment for determination of employability related to Mitchell. (Tr. 236-39). LoVerdi indicated that Mitchell had been receiving mental health treatment since approximately February 2011. (*Id.*). LoVerdi indicated that Mitchell complained of anxiety, feeling overwhelmed, difficulty with concentration, fatigue, and depression. (*Id.*). LoVerdi assessed that Mitchell suffered from panic

disorder with agoraphobia and estimated her GAF to be 60. (*Id.*). According to LoVerdi,

Mitchell had occasionally required medical hospitalization or emergency department visits and

her behavior occasionally interfered with her activities of daily living. (*Id.*). LoVerdi also

indicated that Mitchell frequently interacted inappropriately with others. (*Id.*). She opined that

Mitchell was moderately limited (*i.e.*, unable to function ten to twenty-five percent of the time)

in her ability to maintain attention and concentration for role tasks. (*Id.*). LoVerdi opined that

for the next six months, Mitchell would be unable to participate in any activities except for

treatment. (*Id.*). According to LoVerdi, Mitchell's symptoms of anxiety and depression would

be expected to improve so long as Mitchell's physical health improved. (*Id.*).

      On January 22, 2015, LoVerdi completed another psychological assessment for

determination of employability related to Mitchell. (Tr. 630-34). LoVerdi indicated that she had

met with Mitchell approximately eleven times during the previous year and that she continued to

suffer from panic disorder with agoraphobia. (*Id.*). She assessed Mitchell's GAF to be 62. (*Id.*).

According to LoVerdi, Mitchell was unable to use public transportation and was moderately

limited in her ability to maintain attention and concentration for role tasks. (*Id.*). LoVerdi

indicated that Mitchell continued to experience feelings of being overwhelmed due to social and

personal stressors and her medical symptoms. (*Id.*). According to LoVerdi, Mitchell needed

additional treatment to meet her goals and stabilize her mood. (*Id.*). She opined that Mitchell

would be unable to engage in activities other than treatment for the next six months. (*Id.*).

      **6.**    **Michael Maceroli's Opinions**

      On January 20, 2014, Michael Maceroli ("Maceroli"), MD, an orthopedic surgeon

employed by URMC Orthopaedic Community Care Clinic, completed a physical assessment for

determination of employability related to Mitchell. (Tr. 428-31). Maceroli indicated that during

the past year, Mitchell had been evaluated approximately five times.  (*Id.*).  According to

Maceroli, despite knee surgery, Mitchell continued to experience ongoing pain.  (*Id.*).  Maceroli

opined that Mitchell would be unable to participate in activities other than treatment or

rehabilitation for the next four to six months.  (*Id.*).  Maceroli opined that Mitchell was not

limited in her ability to sit in excess of four hours, but was very limited (*i.e.*, limited to one to

two hours per workday) in her ability to walk, stand, push, pull, bend, lift, and carry.  (*Id.*).


## III.    Administrative Testimony

During the administrative hearing, Mitchell testified that she was born in 1972

and lived with her two youngest children, aged eleven and seventeen.  (Tr. 44).  According to

Mitchell, she had attended school through the ninth grade and had obtained her GED.  (Tr. 56).

Mitchell reported previous employment as a security guard and housekeeper at nursing homes or

hospitals.  (Tr. 44-47, 56-59).  According to Mitchell, she stopped working in December 2011

due to her knee impairment.  (Tr. 45, 48).

Mitchell testified that despite having surgery and cortisone shots, she continued to

experience consistent pain in her knee.  (Tr. 48).  According to Mitchell, her pain was

exacerbated by prolonged sitting and standing.  (Tr. 48-49).  She estimated could stand for

approximately thirty minutes and walk for approximately ten minutes before feeling increased

pain.  (Tr. 49-50).  She testified that she continued to perform home exercises and anticipated

returning to physical therapy if she did not improve.  (Tr. 50).  Mitchell testified that she had

difficulty performing some household chores, such as preparing meals and washing laundry

without assistance from her son.  (Tr. 54).

Mitchell indicated that she also suffered from chronic anxiety and depression. (Tr. 50). According to Mitchell, she had received mental health treatment for approximately two years, currently with LoVerdi, and was taking Xanax, Paxil, and a sleeping medication as needed. (Tr. 51-52). Mitchell testified that she had suffered a panic attack approximately a year earlier, which required a visit to the emergency department, and continued to suffer from anxiety, characterized by feeling worthless, worried, and overwhelmed. (Tr. 52-53). Mitchell explained that she had difficulty leaving the house at times. (Tr. 53).

Mitchell testified that during a typical day she attended appointments, made phone calls, and sometimes took short naps. (Tr. 54). She reported that she felt confused at times and had difficulty with concentration and comprehension, which caused frustration. (Tr. 54-55). Mitchell estimated that she could concentrate for approximately twenty minutes at a time. (Tr. 55). Mitchell testified that she had discussed returning to work with LoVerdi, and LoVerdi had recommended that she focus on treatment for the time being. (*Id.*).

Vocational expert, Julie Andrews ("Andrews"), also testified during the hearing. (Tr. 57-63). The ALJ first asked Andrews to characterize Mitchell's previous employment. (Tr. 59). According to Andrews, Mitchell previously had been employed as a housekeeper/cleaner and a security guard. (*Id.*).

The ALJ asked Andrews whether a person would be able to perform Mitchell's previous jobs who was the same age as Mitchell, with the same education and vocational profile, and who could perform the full range of sedentary work, including occasionally lifting or carrying ten pounds, frequently lifting and carrying less than ten pounds, standing or walking at least two hours per day and sitting about six hours per day, occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, but could never climb ladders,

28

ropes, or scaffolds, and who was capable of understanding, remembering and carrying out simple

instructions and tasks, maintaining concentration and focus for up to two hours at a time on a

consistent basis, could occasionally interact with coworkers and supervisors, but required little to

no contact with the general public, and could perform work in a low-stress environment, with

minimal changes in work routine and processes and no supervisory duties, independent

decision-making, or strict production quotas. (Tr. 60). Andrews testified that such an individual

would be unable to perform the previously-identified jobs, but would be able to perform other

positions in the national economy, including preparer and label pinker. (Tr. 60-61).

        Mitchell's attorney then asked whether jobs would exist for the same individual

with the same limitations, except that the individual would not be able to follow simple one or

two-step directions and would be off-task and unable to concentrate for up to two hours at a time.

(*Id.*). Andrews testified that such an individual would not be able to maintain employment on a

full-time, competitive basis without special circumstances being provided. (*Id.*).


# DISCUSSION

## I.    Standard of Review

        This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

      To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

      A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry*

*v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

>    (1)    whether the claimant is currently engaged in substantial
>           gainful activity;
>
>    (2)    if not, whether the claimant has any "severe impairment"
>           that "significantly limits [the claimant's] physical or mental
>           ability to do basic work activities";
>
>    (3)    if so, whether any of the claimant's severe impairments
>           meets or equals one of the impairments listed in Appendix
>           1 of Subpart P of Part 404 of the relevant regulations;
>
>    (4)    if not, whether despite the claimant's severe impairments,
>           the claimant retains the residual functional capacity to
>           perform his past work; and
>
>    (5)    if not, whether the claimant retains the residual functional
>           capacity to perform any other work that exists in significant
>           numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

   **A.    The ALJ's Decision**

           In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 18-34).  Under step one of the process, the ALJ found that Mitchell had

not engaged in substantial gainful activity since December 29, 2011, the alleged onset date.

(Tr. 21).  At step two, the ALJ concluded that Mitchell had the severe impairments of status post

left knee surgery, obesity, major depressive disorder, anxiety disorder, and panic disorder

without agoraphobia.  (*Id.*).  The ALJ determined that Mitchell's alleged impairments, including

left shoulder injury, hypertension, and diabetes mellitus, were not severe.  (*Id.*).  At step three, the ALJ determined that Mitchell did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments.  (Tr. 22-24).  With respect to Mitchell's mental impairments, the ALJ found that Mitchell suffered from moderate difficulties in maintaining concentration, persistence or pace, and social functioning, and mild limitations in activities of daily living.  (*Id.*).  The ALJ concluded that Mitchell had the RFC to understand, remember and carry out simple instructions, occasionally interact with coworkers and supervisors, tolerate little to no contact with the general public, work in a low-stress environment, consistently maintain concentration and focus for up to two hours at a time, and to perform sedentary work, except that Mitchell could only occasionally climb ramps and/or stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes or scaffolds. (Tr. 24-32).  At step four, the ALJ determined that Mitchell was unable to perform past work as a cleaner/housekeeper or security guard.  (Tr. 32).  Finally, at step five, the ALJ concluded that Mitchell could perform other jobs in the local and national economy, including preparer and label pinker.  (Tr. 33-34).  Accordingly, the ALJ found that Mitchell was not disabled.  (*Id.*).

### B.    **Mitchell's Contentions**

Mitchell contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 16-1).  First, Mitchell maintains that the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ failed to account for the concentration limitations assessed by LoVerdi.  (Docket ## 16-1 at 17-21; 19 at 1-3).  Additionally, Mitchell contends that the ALJ's physical RFC assessment is not supported by substantial evidence because there are no medical opinions in the record to support the RFC.  (Docket ## 16-1 at 21-24; 19 at 3).

## II.    **Analysis**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

### A.    **Mental RFC Assessment**

I turn first to Mitchell's contention that the ALJ failed to account for limitations assessed by LoVerdi.  (Docket ## 16-1 at 17-21; 19 at 1-3).  Specifically, Mitchell maintains that the ALJ's RFC assessment failed to account for LoVerdi's opinion that Mitchell suffered from moderate limitations in her ability to maintain attention and concentration.  (*Id.*).  According to Mitchell, LoVerdi assessed that she was moderately limited in her ability to maintain attention and concentration, meaning that she was unable to function approximately ten to twenty-five percent of the time.  (*Id.*).  This deficit, Mitchell argues, is incompatible with the conclusion that Mitchell can maintain competitive employment.  (*Id.*).  Thus, despite according significant weight to LoVerdi's opinion, the ALJ must have rejected this limitation without explanation, Mitchell reasons.  (*Id.*).

Having carefully reviewed the ALJ's decision and the evidence relating to Mitchell's mental impairments, I disagree that the ALJ failed to account for the attention and concentration limitations assessed by LoVerdi. In his decision, the ALJ thoroughly discussed LoVerdi's opinion and specifically noted that LoVerdi assessed that Mitchell was "moderately limited (unable to function 10-25% of the time) in maintaining attention and concentration for rote tasks." (Tr. 30). After noting that LoVerdi was not an acceptable medical source, the ALJ determined that LoVerdi's opinion would be accorded significant weight "insofar as it indicates only moderate limitations" in Mitchell's ability to function. (*Id.*).

After comprehensively reviewing the record, including the medical opinions of Mitchell's mental capabilities provided by Ransom, Harding, Hochberg and LoVerdi, the ALJ concluded that Mitchell was capable of simple work so long as she had limited contact with others and a low-stress environment and would not be expected to maintain concentration and attention for more than two hours at a time. (Tr. 24-32). Contrary to Mitchell's contention, the ALJ incorporated LoVerdi's opinion into his RFC assessment by including the limitation that Mitchell be required to sustain attention and concentration for only up to two hours at a time. *See Ross v. Colvin*, 2015 WL 1189559, *11 (W.D.N.Y. 2015) ("[c]ontrary to [plaintiff's] contention, I conclude that the ALJ incorporated [the consultant's] opinion into his RFC assessment by including the limitation that [plaintiff] could only sustain attention and concentration for up to two hours at a time"); *Buscemi v. Colvin*, 2014 WL 4772567, *14 (W.D.N.Y. 2014) (ALJ adequately accounted for attention and concentration limitations in the RFC assessment "by incorporating the limitation that [claimant] could only sustain attention and concentration for up to two hours at a time"). Mitchell has failed to provide any support for her contention that LoVerdi's conclusion that she had moderate limitations in her ability to maintain

concentration and attention required the ALJ to conclude that she would be unable to maintain concentration and attention for up to two hours at a time.

I similarly reject Mitchell's contention that an assessment of moderate limitations in attention and concentration is inconsistent with the ability to maintain competitive employment.  (Docket # 16-1 at 20).  Although Mitchell concedes that the record lacks any such testimony from the vocational expert, Mitchell maintains that expert testimony provided in other cases supports this contention.  (*Id.*).  Despite the opportunity to do so, however, Mitchell's attorney did not question the vocational expert on this topic.  In any event, numerous other cases support the contrary conclusion –an inability to maintain concentration or attention for up to ten percent of the day does not preclude competitive employment.  *See Vlado v. Berryhill*, 2017 WL 1194348, *2 (E.D.N.Y. 2017) (vocational expert testified that the identified jobs would be available for an individual who "would be off task ten percent of the day"); *Paredes v. Comm'r of Soc. Sec.*, 2017 WL 2210865, *9 (S.D.N.Y. 2017) (vocational expert testified that an individual could be "off task up to 10 percent of the time" in the identified jobs); *Miller v. Colvin*, 2016 WL 165718, *6 (W.D.N.Y. 2016) (vocational expert testified that an individual who was off-task up to ten percent of the workweek could transition to other work existing in the national economy); *Molina v. Colvin*, 2014 WL 3445335, *5 (S.D.N.Y. 2014) (vocational expert testified that the identified jobs would be available in significant numbers in the national economy for an individual who was off-task ten percent of the workday); *Allen v. Colvin*, 2013 WL 6795715, *5 (W.D.N.Y. 2013) (vocational expert testified that an individual who was "likely to be off task 10 percent of the time due to attention or concentration problems" would be able to perform the identified jobs).

Nothing in the record suggests that Mitchell's mental impairments would prevent her from performing unskilled work with the limitations identified by the ALJ. Indeed, the record reflects that Mitchell was able to manage her own finances and was responsible for maintaining a household, which included her two sons. Although Mitchell continued to receive mental health treatment, the treatment notes indicate that medication was generally effective in controlling her mood, and, by the beginning of 2014, Mitchell reported that she felt ready to return to the workforce. LoVerdi, her therapist, assisted her in that respect by helping her complete relevant paperwork. I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

### B.    Physical RFC Assessment

Mitchell's principal challenge to the ALJ's physical RFC assessment derives from her mistaken belief that the ALJ concluded that she was capable of a reduced range of *light* work. (Docket # 16-1 at 21-24). In a single paragraph in her reply papers, Mitchell concedes that the ALJ in fact concluded that she was capable of performing a reduced range of *sedentary* work, but argues that this conclusion is also unsupported by the medical opinions of record. (Docket # 19 at 3).

According to Mitchell, the ALJ's conclusion that she was capable of occasionally lifting up to ten pounds is not supported by Toor's opinion that she had "moderate to severe"

limitations for lifting, nor is it supported by Marceoli's opinion that Mitchell was "very limited" – *i.e.*, able to perform for one to two hours of the workday – in her ability to lift and carry. (Docket ## 16-1 at 21-24; 19 at 3). The ALJ considered both of these opinions in formulating Mitchell's RFC. (Tr. 28, 30). With respect to Toor's opinion, the ALJ accorded the opinion significant weight, insofar as Toor opined that Mitchell suffered from only moderate physical limitations, which the ALJ found was consistent with the record, including Mitchell's activities of daily living. (Tr. 28). Similarly, the ALJ accorded significant weight to Marceoli's opinion that Mitchell could lift up to two hours per day, which he concluded was consistent with Mitchell's activities of daily living, her relatively conservative post-surgery treatment, and Toor's opinion of moderate lifting limitations. (Tr. 30). Contrary to Mitchell's contention, the ALJ's conclusion that she was capable of occasionally lifting up to ten pounds is not necessarily inconsistent with the lifting limitations assessed by Toor and Maceroli. *See Killings v. Comm'r of Soc. Sec.*, 2016 WL 4989943, *13 (S.D.N.Y.) ("opinion of a consultative examiner . . . that plaintiff had a moderate to severe limitation for lifting and carrying . . . was generally consistent with a conclusion that plaintiff could do sedentary work"), *report and recommendation adopted by*, 2016 WL 6952342 (S.D.N.Y. 2016); *Silsbee v. v. Colvin*, 2015 WL 4508599, *15 (N.D.N.Y. 2015) ("'[m]oderate' limitations in lifting and carrying would be consistent with an ability to lift and/or carry ten pounds occasionally and less than ten pounds frequently"); *Mendoza v. Astrue*, 2008 WL 5054243, *10 (N.D.N.Y. 2008) (ALJ's conclusion that plaintiff retained the ability to lift and carry up to ten pounds was not contradicted by doctor's assessment that plaintiff was "'very limited' in her ability to lift and carry").

In any event, "[a]lthough the RFC must be supported by medical opinions, it is ultimately the ALJ's duty to formulate the RFC after evaluating the opinion evidence, treatment

records and the testimony of the claimant." *Davis v. Colvin*, 2017 WL 745866, *11 (W.D.N.Y. 2017). Based upon Toor's and Marceoli's opinions, and the record as a whole, including Mitchell's activities of daily living, her treatment history reflecting relatively conservative post-surgery treatment, and her non-compliance with therapy and non-weight bearing treatment recommendations, the ALJ determined that although Mitchell's physical condition limited her ability to do some work-related activities, she nonetheless retained the ability to perform the lifting requirements of sedentary work. I conclude that the ALJ's physical RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d at 410.

## <u>CONCLUSION</u>

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 18)** is **GRANTED**. Mitchell's motion for judgment on the pleadings **(Docket # 16)** is **DENIED**, and Mitchell's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                                 *s/Marian W. Payson*
                                               MARIAN W. PAYSON
                                         United States Magistrate Judge

Dated: Rochester, New York
             July 27, 2017